STATE of Wisconsin, Plaintiff-Appellant,

v.

Dennis Lee LONDO, Defendant-Respondent.†
[Case No. 01–1015–CR]

STATE of Wisconsin, Plaintiff-Appellant,

v.

Richard John VERNON, Defendant-Respondent.†
[Case No. 01–1559–CR]

Court of Appeals

*Nos. 01–1015–CR, 01–1559–CR. Submitted on briefs February 5, 2002.—Decided March 5, 2002.*

2002 WI App 90

(Also reported in 643 N.W.2d 869.)

† Petitions to review denied 5-21-02.

733

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Lara M. Herman*, assistant attorney general.

On behalf of the defendant-respondent, Dennis Lee Londo, the cause was submitted on the brief of *Michael B. Plaisted*, Milwaukee.

On behalf of the defendant-respondent, Richard John Vernon, the cause was submitted on the brief of *Dennis P. Coffey* and *Seth P. Hartigan* of *Cook & Franke S.C.*, Milwaukee.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J. The State of Wisconsin appeals from orders entered by the trial court granting: 1) a motion made by Dennis Lee Londo to suppress evidence discovered by police officers in a house that he shared with Richard John Vernon; and 2) a motion made by Vernon to withdraw his guilty plea and to suppress the same evidence. We have consolidated the appeals. We reverse.

## I.

¶ 2. Both defendants were charged with the un-
lawful manufacture of tetrahydrocannabinols, as party
to a crime. *See* Wis. STAT. §§ 961.14(4)(t), 961.41(1)(h)3,
and 939.05. The charges were based on the discovery by
police of a marijuana-growing operation in the home
where they both lived. Vernon pled guilty. Londo suc-
cessfully challenged entry by the police into their home.
The trial court then permitted Vernon to withdraw his
guilty plea, and, on the evidence adduced during the
hearing on Londo's motion, granted Vernon's belated
suppression motion.

¶ 3. The only person to testify at the suppression
hearing was Milwaukee police officer Dawn Veytsman.
She told the trial court that shortly after 4 p.m. she and
her partner were flagged down by a citizen who told
them that she had heard the breaking of glass at the
rear of a nearby house. She said that she saw a man
standing close to the house's back door. The officers
investigated. One of the glass panels in the door's
four-pane window was broken. Broken glass was on the
ground near the door, which was still locked.

¶ 4. The officers then checked the area in a four-
block radius from the house, but found no one. When
they returned after approximately five minutes, they
noticed that a window that had been previously closed
was now open by about three feet. The window was
seven feet from the ground. Officer Veytsman told the
trial court that after she knocked on the door and got no
response, she entered the house through the window
"[t]o check the residence—inside the residence to see if
there was anybody else inside." She had to be helped
through the window by her partner. They did not have
a warrant.

¶ 5. Once inside the house, Officer Veytsman called out to see if anyone was home, and identified herself as a police officer. She got no response. She then searched possible hiding places, and let her partner in through a window. It was during that search that she found evidence of a marijuana-growing operation. They never saw anyone either inside or outside of the house.

¶ 6. As noted, the trial court granted Londo's and Vernon's motions to suppress, ruling that although the officers had probable cause to believe that there was a burglary at the house, there were no exigent circumstances that justified their warrantless entry.

## II.

¶ 7. This appeal requires us to "balance the government's interest in law enforcement with the individual's right to be left alone." *See State v. Hughes*, 2000 WI 24, ¶ 16, 233 Wis. 2d 280, 289, 607 N.W.2d 621, 626. "Government" is, of course, surrogate for the community it serves; law enforcement protects society. There are three issues presented by this appeal: 1) whether the police had probable cause to search the defendants' house; 2) if so, whether the officers' warrantless entry into the house was lawful; and 3) if so, whether the officers' search was lawful. In making our analysis, we accept the trial court's findings of fact unless they are clearly erroneous. *See* Wis. Stat. Rule 805.17(2) (made applicable to criminal proceedings by Wis. Stat. § 972.11(1)); *Hughes*, 2000 WI 24 at ¶ 15. "We then independently apply the law to those facts *de novo*." *Ibid.* We discuss the issues in turn.

A. *Probable cause.*

■

¶ 8. The trial court determined that the officers had probable cause to search the defendants' house because of all the indications that someone had unlawfully entered that house. On our independent review, we agree.

■

¶ 9. "The quantum of evidence required to establish probable cause to search is a 'fair probability' that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983)." *Hughes*, 2000 WI 24 at ¶ 21. The test is whether, under the circumstances, what the officers did was "reasonable." *Id.*, 2000 WI 24 at ¶ 23. Here, the officers faced a situation that was wholly consistent with an ongoing burglary or other unlawful entry. *See* WIS. STAT. § 943.10(1)(a) (intentional entry into "[a]ny building or dwelling . . . with intent to steal or commit a felony in such place" is a burglary).

- A citizen witness, whose reliability the defendants do not challenge, told the officers that she heard the breaking of glass and saw a man near the back door of a house from which the sound came;

- The officers went to the house and saw a broken pane in the back door's window;

- The officers saw broken glass near the back door;

- The back door was locked;

- After they searched the neighborhood, they returned to the house where they saw that a window that had been closed five minutes earlier was open by approximately three feet; and

737

• No one answered an officer's knock on the door.

Under this scenario, it was perfectly reasonable for the officers to conclude that someone had tried to get into the house through the back door by breaking one of the panes of glass but was unsuccessful. It was also reasonable for them to conclude that the person (or persons, if there were confederates) opened the window and entered the house while the officers were gone, especially since their search of the neighborhood yielded no suspects. Thus, it was reasonable for the officers to believe that when they returned from their search of the neighborhood someone was inside the house unlawfully. There was thus probable cause for them to search the house for either a suspect or evidence of that burglary.

B. *Warrantless entry.*

¶ 10. "A warrantless search of a home is presumptively unreasonable under the Fourth Amendment." *State v. Richter*, 2000 WI 58, ¶ 28, 235 Wis. 2d 524, 540, 612 N.W.2d 29, 36. Exigent circumstances that militate against the delay in getting a warrant can, however, justify immediate entry and search. *Ibid.* The State must prove "the existence of exigent circumstances." *Id.*, 2000 WI 58 at ¶ 29. Our analysis of whether the officers acted reasonably in entering the house without a warrant is measured against the "totality of the circumstances." *State v. Garrett*, 2001 WI App 240, ¶ 16, 248 Wis. 2d 61, 71, 635 N.W.2d 615, 620. The test is objective: what a reasonable police officer would reasonably believe under the circumstances—not what Officer Veytsman or her partner might have believed. *See Richter*, 2000 WI 58 at ¶ 30.

There are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: 1) hot pursuit of a suspect, 2) a threat to the safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee.

*Richter*, 2000 WI 58 at ¶ 29. Here, the officers faced the following facts or reasonable inferences:

- They came upon an attempted unlawful entry that was apparently thwarted when they went to the house shortly after the citizen witness told them that she had heard the breaking of glass and had seen a man near the back door to the house where the sound came from;

- During the five minutes they were away from the house, someone had opened a window wide enough for a person to enter the house;

- No one answered the officer's knock on the door; thus, it was reasonable for the officers to conclude that the window was not opened by someone lawfully in the house; and

- The lack of response to the officer's knock meant one of several things: 1) no one was in the house; 2) someone was unlawfully in the house alone, but hiding; or 3) someone was unlawfully in the house, but had one or more lawful residents under his or her control.

Household burglaries present real and grave risks. This is how the Maryland Court of Special Appeals described the danger in 1987:

According to recent Department of Justice statistics, "[t]hree-fifths of all rapes in the home, three-fifths of all home robberies, and about a third of home aggravated and simple assaults are committed by burglars." Bureau of Justice Statistics Bulletin, Household Burglary

739

1 (January 1985). During the period 1973–1982, 2.8 million such violent crimes were committed in the course of burglaries. *Ibid* . . . . Moreover, even if a particular burglary, when viewed in retrospect, does not involve physical harm to others, the "harsh potentialities for violence" inherent in the forced entry into a home preclude characterization of the crime as "innocuous, inconsequential, minor, or 'nonviolent.' "

*Wynn v. State*, 518 A.2d 1072, 1077 (Md. Ct. Spec. App. 1987) (quoted source omitted), *aff'd in part and rev'd in part by Wynn v. State*, 546 A.2d 465 (Md. 1988). *See also In re Sealed Case*, 153 F.3d 759, 767 (D.C. Cir. 1998) (burglaries present danger to lawful occupants). As the prosecutor observed at the start of the evidentiary hearing on Londo's motion to suppress:

> [W]hat would be the flip side of this if the officers had not chosen to go in, if something horrible had happened[?] I can't believe [but] that [the officers] would have been totally crucified in the press as probably [they would have] in their department if someone was in the house, if they had information someone was lurking there outside and that harm came to a person in that house . . . and I think the court has to look at the flip side.

We agree. As noted, we must balance the interests we all have to be free from unjustified governmental intrusion against our need to have government protect us from predators. Here, the possible grave danger to the occupants of the house outweighed the intrusive aspects of the officer's warrantless entry. The trial court also implicitly recognized this when it observed:

> I agree that most homeowners would want police to enter their home if they saw what was occurring to do a protective sweep, make sure no one's in the home. I, for one, would want someone if they saw broken glass

and came back later and saw a window open, I person-
ally would want police to go into my home to make sure
someone's not hiding in there, just to do a protective
sweep of the property; but I have to apply the laws that
exist, and there was no testimony elicited from the
officer that exigent circumstances applied in this case.

But the subjective motivation of Officer Veytsman and
her partner, especially as that motivation may have
been inartfully revealed during her testimony, and her
failure to testify that she and her partner were con-
cerned about anyone's safety, are all not relevant;
objectively, a reasonable officer would have been aware
of the danger and the need to immediately go into the
house to ensure that no one was in jeopardy. Indeed,
Officer Veytsman *did* recognize the danger; she told the
trial court that she had her gun drawn during her
search. We have no doubt but that the officers did the
right and lawful thing by not waiting to get a warrant.

C. *Scope of the search.*

¶ 11. The defendants contend that the officers
exceeded the permissible scope of their search. We
disagree. Although the trial court did not address this
issue, there is no evidence in the record that the officers
entered the house for any reason other than to look for
someone who might have entered the house illegally.
Indeed, all of the evidence is that they looked only in
places where someone could hide, and were not search-
ing for contraband. *See Garrett*, 2001 WI App 240 at
¶ 22 (the search must be " 'narrowly confined to a
cursory visual inspection of those places in which a
person might be hiding.' ") (quoting *Maryland v. Buie*,

494 U.S. 325, 327 (1990)). Accordingly, the officers did not exceed the permissible scope of their search.

## III.

¶ 12. Based on the foregoing, we conclude that the officers: 1) had probable cause to search the defendants' house; 2) faced exigent circumstances because, objectively, a reasonable officer would have concluded that at least one person was in the house unlawfully, possibly holding a resident hostage; and 3) conducted a limited and entirely appropriate sweep to ensure that no one was in danger. Thus we reverse the trial court's suppression orders. Inasmuch as the trial court's order granting Vernon permission to withdraw his guilty plea was predicated on its suppression orders, we reverse that order as well.

*By the Court.*—Orders reversed and cause remanded with directions.