STATE of Wisconsin, Plaintiff-Respondent,

v.

Walter LEUTENEGGER, Defendant-Appellant.

Court of Appeals

*No. 03–0133–CR. Submitted on briefs September 8, 2003.— Decided June 24, 2004.*

2004 WI App 127

(Also reported in 685 N.W.2d 536.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Bill Ginsberg* of *Mandell & Ginsberg*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jonathon G. Kaiser*, assistant district attorney for Dane County.

Before Vergeront, Lundsten and Higginbotham, JJ.[1]

¶ 1. LUNDSTEN, J. This case involves the exigent circumstances exception to the general requirement that an officer have a warrant before making a nonconsensual entry into a home. A police officer entered Walter Leutenegger's garage without a warrant after receiving information indicating that Leutenegger was highly intoxicated and locating him in his car in his garage. Leutenegger was subsequently arrested, prosecuted, and convicted of driving while intoxicated. Leutenegger appeals, arguing that the circuit court should have suppressed evidence obtained after the officer entered his garage because that entry was illegal. We disagree and affirm the circuit court.

### Background

¶ 2. On July 2, 2001, a citizen telephoned police to report what he believed to be an intoxicated driver. The citizen, using a cell phone, called from a tavern parking lot and gave specific information indicating that a man, later identified as Leutenegger, was very intoxicated

---

[1] This case was converted from a one-judge appeal to a three-judge appeal pursuant to Wis. Stat. § 809.41(3) (2001–02).

and was driving a car away from the tavern. Using information supplied by the citizen, a police officer located Leutenegger sitting in his car in an attached garage to Leutenegger's home. After viewing the situation for a short time, the officer approached Leutenegger's open garage door and proceeded into the garage, making contact with Leutenegger, who was still in his car. After entering the garage, the officer made observations supporting the inference that Leutenegger was intoxicated. Leutenegger was arrested, and police subsequently obtained a breath test result showing that Leutenegger's blood alcohol content was .28%.

¶ 3. Leutenegger moved to suppress all evidence obtained after the police officer entered his garage. The circuit court concluded that the attached garage was part of the curtilage of the Leutenegger residence and, therefore, the officer's warrantless entry into the garage was presumptively unconstitutional. However, the court also concluded that the entry was justified by exigent circumstances, and denied the motion. Leutenegger then pled no contest to the charge of operating a motor vehicle while intoxicated, fourth offense. He now challenges the circuit court's suppression ruling. More detailed facts are set forth later in this opinion.

## *Discussion*

*Consideration of an Officer's Subjective Beliefs When the Asserted Justification for a Warrantless Entry of a Home is the Possible Need to Render Assistance or Prevent Harm*

¶ 4. The question in this case is whether the officer's warrantless entry into Leutenegger's attached garage was lawful because of a possible need to render

assistance or prevent harm. Leutenegger, relying on *State v. Boggess*, 115 Wis. 2d 443, 340 N.W.2d 516 (1983), argues that the officer's action must have been *subjectively* motivated by a perceived safety concern, that is, that the particular officer must have subjectively believed that Leutenegger likely needed assistance or still posed a danger to others. Further, Leutenegger contends that the record in this case does not support a finding that the officer was actually motivated by her concern for the safety of Leutenegger or others.

¶ 5. We disagree with Leutenegger that the objective/subjective test used in *Boggess* is the correct test to apply here. More recently, the supreme court employed an objective test in *State v. Richter*, 2000 WI 58, ¶ 30, 235 Wis. 2d 524, 612 N.W.2d 29, and we conclude we must follow this more recent decision. *See Jones v. Dane County*, 195 Wis. 2d 892, 918 n.8, 537 N.W.2d 74 (Ct. App. 1995) ("[The court of appeals is] bound by the most recent pronouncements of the Wisconsin Supreme Court.").

¶ 6. In *Boggess*, the supreme court used the term "emergency rule" when faced with the State's argument that a warrantless home entry was legal because of a report that children had been battered, were in need of medical attention, and lived with a man named Boggess who had a "bad temper." *Boggess*, 115 Wis. 2d at 445, 446, 457–58. The *Boggess* court relied on *State v. Pires*, 55 Wis. 2d 597, 604, 201 N.W.2d 153 (1972), which equates the "emergency doctrine" with the "exigent-circumstance rule." *Boggess*, 115 Wis. 2d at 450. The two-pronged objective/subjective test used in *Boggess* does not come from *Pires*, however, but instead from *State v. Prober*, 98 Wis. 2d 345, 297 N.W.2d 1 (1980),

*overruled on other grounds, State v. Weide,* 155 Wis. 2d 537, 455 N.W.2d 899 (1990). Under the two-pronged objective/subjective test used in *Boggess,* a warrantless entry based on a safety concern is illegal unless the entering officer subjectively believes that entry is necessary to render assistance or prevent harm. *See Boggess,* 115 Wis. 2d at 449–51; *see also State v. Rome,* 2000 WI App 243, 239 Wis. 2d 491, 620 N.W.2d 225 (two-pronged objective/subjective test used where police entered a home without a warrant based on information that a man was a threat to a young girl in the home with him).

¶ 7. If we applied the objective/subjective test used in *Boggess,* we would need to address Leutenegger's argument that the record does not support the circuit court's factual finding that the officer here was motivated in part by a belief that Leutenegger might need assistance and that Leutenegger still posed a danger to others. However, when our supreme court most recently dealt with a proffered safety justification for a warrantless entry under circumstances similar to those before us—that is, in *Richter*—it applied a purely objective test.[2]

---

[2] The State has not argued that the entry into Leutenegger's garage was justified under the "community caretaker" doctrine. We need not address the "community caretaker" doctrine, or its relationship to *State v. Richter,* 2000 WI 58, 235 Wis. 2d 524, 612 N.W.2d 29, because we conclude that *Richter* alone provides an appropriate framework for analyzing the entry at issue here. We note, however, that the "community caretaker" test has been applied where the State justified a warrantless home entry based on safety concerns regarding possible occupants. *See State v. Paterson,* 220 Wis. 2d 526, 533–34, 583 N.W.2d 190 (Ct. App. 1998) (warrantless entry based on neighbor's report of suspicious activity in a residence suggesting a possible burglary in progress and, therefore, a possible threat to the occupants of the apartment). We further

¶ 8. One issue in *Richter* was whether an officer's warrantless entry into a mobile home was justified by a possible need to render assistance to the occupants. In that case, an officer was dispatched to a mobile home park because of a report of a burglary in progress. *Richter*, 235 Wis. 2d 524, ¶¶ 3–7. When the officer arrived, he was flagged down by a person who told the officer that someone had broken into her mobile home and that she had seen the intruder flee her home and enter another mobile home across the street. *Id.*, ¶ 3. The officer went to that mobile home and observed signs of a forced entry. The officer entered the mobile home and that entry led to incriminating evidence against the defendant who, as it turned out, was the owner of that mobile home. *Id.*, ¶¶ 4–9.

¶ 9. The *Richter* court framed the question this way: "whether [the officer's] warrantless entry into [the defendant's] trailer was justified by the exigent circumstances exception to the warrant requirement and therefore valid under the Fourth Amendment and its Wisconsin constitution counterpart." *Id.*, ¶ 26. "Exigent circumstances" is a term that encompasses several more specific exceptions. The *Richter* court explained:

> There are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: 1) hot pursuit of a suspect, 2) a threat to the safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee.

*Id.*, ¶ 29. The State argued the "hot pursuit" exception, but separately argued that the warrantless entry was

---

observe that neither *Richter* nor *State v. Boggess*, 115 Wis. 2d 443, 340 N.W.2d 516 (1983), mentions the community caretaker doctrine.

justified because of "a threat to the safety of the suspect or others." *Id.*, ¶¶ 31, 37. The *Richter* court agreed with this alternative "threat to safety" argument:

> Focusing on what *was* known and could reasonably be inferred by the officer at the time of the entry, we conclude that [the officer] reasonably believed that the intruder he was pursuing posed a threat to the safety of the occupants of Richter's trailer. It was the middle of the night. A stranger had just broken into the Champions' trailer, but was discovered and therefore abandoned whatever crime he intended to commit inside, fleeing into Richter's trailer across the street. There were obvious signs of forced entry at Richter's trailer—an open window (in 40–degree weather), and the knocked out screen lying on the ground. It was reasonable to infer from this that the suspect did not belong there but in fact had broken in, just as he did at the Champions'. There were people sleeping inside Richter's trailer at the time the intruder entered, creating a situation fraught with potential for physical harm if something was not immediately done to apprehend the suspect.

*Id.*, ¶ 41.

¶ 10. Thus, in *Richter* a stand-alone justification for the warrantless entry was the prevention of possible harm to the occupants of the mobile home. The State makes essentially the same argument here that it made in *Richter*: that exigent circumstances justified the warrantless entry because there was reason to believe Leutenegger was in need of assistance or still posed a threat to others. We discern no reason why the test should be different when the person suspected of being in danger or of posing a danger is a suspect, rather than some other party. In these situations, it is the urgent need to enter because of the possible need to render immediate assistance or prevent harm that justifies the

warrantless entry.[3] Therefore, we apply *Richter* because it is the most recent supreme court decision on the topic. *See Jones*, 195 Wis. 2d at 918 n.8 ("[The court of appeals is] bound by the most recent pronouncements of the Wisconsin Supreme Court.").

██

¶ 11. Having concluded that *Richter* applies here, we turn to a description of the test used in that case. The test is objective:

> As in other Fourth Amendment cases, the determination of whether exigent circumstances are present turns on considerations of reasonableness, and we apply an objective test. The test is "[w]hether a police officer under the circumstances known to the officer at the time [of entry] reasonably believes that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape."

*Richter*, 235 Wis. 2d 524, ¶ 30 (quoting *State v. Smith*, 131 Wis. 2d 220, 230, 388 N.W.2d 601 (1986)).[4]

¶ 12. A warrantless home entry is presumptively unreasonable under the Fourth Amendment. *Richter*, 235 Wis. 2d 524, ¶ 28. The government bears the

---

[3] We stress that we do not address the community caretaker doctrine and, therefore, do not address whether the distinctions among the situations discussed in the text matter for purposes of that doctrine.

[4] The objective test used in *Richter* was applied to the question whether home entries were justified by safety concerns in both *State v. Londo*, 2002 WI App 90, ¶ 10, 252 Wis. 2d 731, 643 N.W.2d 869, and *State v. Mielke*, 2002 WI App 251, ¶¶ 6–10, 257 Wis. 2d 876, 653 N.W.2d 316, *review denied*, 2003 WI 1, 258 Wis. 2d 108, 655 N.W.2d 128 (Nov. 12, 2002) (No. 01–3116–CR).

burden of establishing that a warrantless entry into a home occurred pursuant to a recognized exception to the warrant requirement. *See State v. Hughes*, 2000 WI 24, ¶ 17, 233 Wis. 2d 280, 607 N.W.2d 621; *State v. Milashoski*, 159 Wis. 2d 99, 110–11, 464 N.W.2d 21 (Ct. App. 1990). "[W]e weigh the urgency of the officer's need to enter against the time needed to obtain a warrant." *Richter*, 235 Wis. 2d 524, ¶ 28.

¶ 13. Whether a warrantless entry into a home is justified by the exigent circumstances exception is a mixed question of fact and law. *Id.*, ¶ 26. A circuit court's findings of evidentiary or historical fact will not be overturned unless they are clearly erroneous. *Id.* This court independently determines whether facts establish exigent circumstances sufficient to justify a warrantless entry. *Id.*

¶ 14. If we stopped our legal discussion here, a reader might erroneously conclude that an officer's subjective belief regarding exigency is irrelevant. However, our supreme court recently held, in the Fourth Amendment context, that evidence of an officer's subjective belief is admissible because such evidence may assist a court in analyzing whether facts known to an officer meet the objective standard. *State v. Kyles*, 2004 WI 15, ¶ 39, 269 Wis. 2d 1, 675 N.W.2d 449. We perceive no reason why this rule should not apply to a court's determination of whether exigent circumstances justify a warrantless entry.

¶ 15. In *Kyles*, the defendant sought to suppress evidence detected during a protective frisk. The legality of the frisk depended on whether the officer had a reasonable suspicion that the defendant was armed and

dangerous. *Id.*, ¶ 7. The central issues in *Kyles* were whether an officer's testimony about that officer's subjective belief regarding the danger posed was properly admitted and, if properly admitted, for what purpose. The court's resolution of both issues is germane here.

¶ 16. First, *Kyles* affirmed that a protective frisk may be deemed reasonable under the Fourth Amendment regardless of the officer's actual subjective perception of danger. The court explained that the reasonableness of a protective search is judged solely on an objective standard, "that is, 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety and that of others was in danger' because the individual may be armed with a weapon and dangerous." *Id.*, ¶ 10 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968), and *State v. McGill*, 2000 WI 38, ¶ 23, 234 Wis. 2d 560, 609 N.W.2d 795). In affirming that the standard is objective, the *Kyles* court explained:

> Because an objective standard is applied to test for reasonable suspicion, a frisk can be valid when an officer does not actually feel threatened by the person frisked or when the record is silent about the officer's subjective fear that the individual may be armed and dangerous. The law is very clear on this point.

*Kyles*, 269 Wis. 2d 1, ¶ 23.

¶ 17. At the same time, *Kyles* clarified that evidence of an officer's subjective belief is admissible because it may assist the court in analyzing whether the facts known to the officer meet the objective standard:

> We conclude that an officer may be questioned about his or her fear or belief that his or her safety or that of others was in danger because the person frisked may have been armed and that a court may consider an

officer's fear or belief that his or her safety or that of others was in danger in determining whether the objective standard of reasonable suspicion. was met under the totality of the circumstances. An officer's legal and subjective conclusions are, however, not determinative of the validity of the frisk; a court applies an objective standard to the facts known to the officer. The officer's fear or belief that the person may be armed is but one factor in the totality of the circumstances that a court may consider in determining whether an officer had reasonable suspicion to effectuate a protective weapons frisk.

*Id.*, ¶ 39.

¶ 18. We conclude that *Kyles* buttresses our conclusion that the test to be applied to the exigent circumstances exception to the warrant requirement is the objective test. Further, *Kyles* supports our conclusion that an officer's subjective belief regarding exigency is admissible evidence because that evidence may assist the court in assessing whether the officer's conduct was objectively reasonable.

¶ 19. To summarize, whether a warrantless home entry is justified based on the need to render assistance or prevent harm is judged by an objective test. "The test is '[w]hether a police officer under the circumstances known to the officer at the time [of entry] reasonably believes that delay in procuring a warrant would gravely endanger life . . . .' " *Richter*, 235 Wis. 2d 524, ¶ 30 (quoting *Smith*, 131 Wis. 2d at 230). In addition to the circumstances known to police at the time of entry, a court may consider the subjective beliefs of police officers involved, but only insofar as such evidence assists the court in determining objective reasonableness. *See Kyles*, 269 Wis. 2d 1, ¶¶ 23, 37, 39.

## Application of the Exigent Circumstances
## Test to the Facts Here

¶ 20. Leutenegger argues that the circuit court erred in denying his motion to suppress evidence obtained as a result of the officer's entry into his garage. He contends that the circuit court went astray when it concluded that the entry was justified by exigent circumstances. Leutenegger argues that facts indicated he was likely drunk, but that no reasonable officer would have thought there was a grave danger to Leutenegger's safety. Also, Leutenegger contends that no reasonable officer would have thought that a grave danger was posed by the fact that Leutenegger might decide to drive back out of his garage. Leutenegger downplays this hazard, asserting that the officer was in a position to stop Leutenegger's car.

■

¶ 21. For the reasons set forth in the previous section, we need not address Leutenegger's argument that the record does not support a finding that the officer was actually motivated by her concern for Leutenegger's safety. We will consider the officer's testimony regarding her belief, but only in the course of determining whether the officer's action was objectively reasonable. Further, we agree with the circuit court's assessment that this is "a difficult case," but also agree with that court that exigent circumstances justified the officer's warrantless entry into Leutenegger's garage.[5]

---

[5] The State does not challenge the circuit court's holding that the garage was part of the curtilage of Leutenegger's house and subject to the warrant requirement. This implicit concession appears appropriate in this case. Published decisions on this topic consistently hold that an attached garage is part of the curtilage. *See Los Angeles Police Protective League v. Gates,*

¶ 22. The record reveals the following. Just past noon on July 2, 2001, a citizen used his cell phone to call 911 from the parking lot of a tavern in Madison.[6] The citizen told the dispatcher that a man, later identified as Leutenegger, appeared very drunk and was attempting to drive away in a car. The citizen described Leutenegger as "an old, extremely drunk guy" who appeared to be in his mid-seventies to early eighties. The citizen said he had seen Leutenegger in the bar where Leutenegger appeared to have been drinking whiskey on the rocks. He said Leutenegger left a cigarette burning in the ashtray and a full drink.

¶ 23. The citizen related much of the information to the dispatcher as the citizen was witnessing the events. He identified Leutenegger's vehicle as an older, dark-colored Hyundai and supplied the license plate number. Referring to Leutenegger, the citizen said: "He just got into his car and he's trying to figure out how to drive it," and "[i]t took him like three minutes just to get out to his car." The citizen told the dispatcher: "He keeps hitting the brake lights. It kind of looks like he was passing out." Asked if Leutenegger

---

907 F.2d 879, 885 (9th Cir. 1990); *State v. Pink*, 648 N.W.2d 107, 109 (Iowa 2002). We caution, however, that such determinations are fact specific and, in a particular case, a house and attached garage may be situated such that entry through an open garage door to an "exterior" house door within the garage may appear to be the least intrusive means of establishing contact with an occupant. Under such circumstances, an attached garage *might* be considered non-curtilage for the limited purpose of making contact with an occupant, similar to some porches. *See United States v. Santana*, 427 U.S. 38, 42 (1976); *State v. Potter*, 72 S.W.3d 307, 313–14 (Mo. Ct. App. 2002).

[6] Several of the facts recited in this opinion come from the dispatch tape which has not been transcribed, but which has been heard by the circuit court and this court.

was passed out, the citizen responded: "No, well he keeps kind of nodding and coming up to and he's got a seat belt on. But he's moving around in there, so I don't think he's passed out. But I think it might be a good idea to get an officer here to keep him from driving 'cause if he makes it out of the parking lot I don't think he's going to make it too far before he runs into something."

¶ 24. The citizen then described what he saw as Leutenegger drove out of the tavern lot: "He's driving off the curb. Almost ran into a sign. It looks like he's getting ready to pull out eastbound on Old Middleton." "Well, he almost pulled out in front of a truck. He's kind of halfway onto the road now. No, looks like he's coming to the left, so he's going westbound." "He just pulled out right in front of traffic." "He's going about three miles an hour."

¶ 25. The citizen followed Leutenegger while remaining on his cell phone with police and said that Leutenegger was driving about sixteen miles per hour. He said Leutenegger turned a corner and "[h]e's doing a couple miles an hour." The citizen related: "He's honking at people that are backing out a half a block away. He's coming to a full stop." The citizen followed Leutenegger to a house. The house was later identified as Leutenegger's house.

¶ 26. The citizen then drove back a few blocks to a main road where he flagged down an officer. This officer had already been apprised of the situation by dispatch, but was not aware of Leutenegger's prior OWI convictions. The citizen and the officer then drove their cars to Leutenegger's house where the citizen told the officer that he had not seen Leutenegger get out of his car. The officer stood in the street in front of Leutenegger's house and could see through the open

overhead garage door into the attached garage. The lone car in the garage matched the description the citizen had provided to the dispatcher. The officer observed, from a distance of about fifteen to twenty yards, that Leutenegger was still in the driver's seat. The only testimony the officer gave regarding her subjective belief regarding safety was that Leutenegger was still in his car and "[m]ost people when they pull their car into the garage they exit their vehicle and go into their house. So I was concerned about that." After about a minute, the officer approached, entered the open garage door, and got Leutenegger's attention by knocking on the passenger window.

¶ 27. The circuit court provided a thoughtful analysis of the situation, explaining that the entry was justified both to ascertain the welfare of Leutenegger and to prevent Leutenegger from causing harm to others by backing out of his garage:

> What we have is a report of an old, translates elderly person, with apologies to Mr. Leutenegger, as I see him in the courtroom, he is a gentleman with gray hair. But he was reported to be old and extremely intoxicated.
>
> People who think that intoxication is not a life-threatening condition only need to acquaint themselves with the activities of detox, the death of young healthy students from over-intoxication, or have any understanding of the interaction of greater vulnerability of older people and the greater likelihood of being on prescription medications and the danger of interactions of alcohol with such prescription medications to understand that when you have an extremely intoxicated older person that it raises a much stronger concern for the welfare of the person.

Now, the officer wasn't getting – because the officer had reports that this person was so impaired that he couldn't figure out how to drive the car. That it took an inordinately long time to get out to the car. That it appeared that the person was passing out. That the person would nod up and come to. And the plea was to get an officer there to keep this person from leaving the parking lot.

To show the danger of the car leaving the parking lot, one only needs to recall that this car pulled out across the path of a truck, that it was going three miles an hour, so there was nothing sudden that would interfere with the ability to see the vehicle, and the car just pulled out like the truck wasn't there. That creates a high degree of danger and underlines the seriousness of the impairment.

It almost struck a sign. It demonstrated that the driver was having a great deal of difficulty judging where he was and what was his relationship to the road, to other people, that is shown by the beeping at people a half a block away.

The officer also had information it appeared he was drinking whiskey straight on the rocks. That he left a burning cigarette in the ashtray . . . .

The officer arrived a minute after the vehicle had arrived according to the citizen witness and the officer, and the person did not exit the vehicle. The officer did not know why. Whether the person had passed out; whether the person was comatose; whether the person had vomited and aspirated the vomit; are all possibilities that the officer could not judge without entering in to at least ascertain welfare.

. . . .

. . . [T]he officer was able to observe that there was no exit from the vehicle and return to the house . . . .

There are also aspects of danger to others that I think on an objective basis were present. The officer didn't testify about them. They are that this – that the vehicle, as long as the driver was in the driver's position, could start the car and commence driving again.

One can present a grave danger to others going three miles per hour. That was demonstrated by pulling out of the lot in front of an oncoming truck that would have every reason to believe that that car would not come out into the roadway. And whether or not the officer standing at the foot of the driveway could stop the car from doing that is very, very doubtful [in] my mind.

¶ 28. We agree with this analysis. The facts would have led a reasonable officer to conclude that Leutenegger was in his seventies or eighties and highly intoxicated. As the circuit court explained, this age, combined with a high degree of intoxication, would lead a reasonable officer to be concerned about Leutenegger's health.

¶ 29. The officer also observed that Leutenegger delayed leaving his car for no apparent reason. The officer knew that the citizen had followed Leutenegger to Leutenegger's home and returned a short distance to a main street where the citizen made contact with the officer. After driving a short distance to Leutenegger's house, the officer stood in the street for about a minute. Combining these time periods, it is apparent that, after driving into his garage, Leutenegger sat in his car for at least two to three minutes before the officer entered the garage. This might seem like a short time, unless one looks at a clock, watches two or three minutes go by, and considers the normal time it takes to get out of a car after parking.

¶ 30. The circuit court credited the officer's testimony that she was subjectively motivated, in part, by a concern for Leutenegger's safety. Part of this testimony

provides some assistance. The officer said she was concerned because "[m]ost people when they pull their car into the garage they exit their vehicle and go into their house." The obvious inference is that the officer thought Leutenegger might be experiencing a physical problem related to his intoxication that was preventing him from taking the normal action of exiting his car and entering his home. We agree with the officer that most people exit their cars shortly after parking at their homes. We also assume, as we infer the circuit court assumed, that it appeared to the officer that Leutenegger was simply sitting in the driver's seat, as opposed to moving about gathering items or engaging in some other activity.[7] To this extent, the officer's testimony reflects that her subjective belief was based on a common-sense assumption regarding normal human activity. We agree with the circuit court that this circumstance, combined with other information, suggested a current intoxication-related health problem.

¶ 31. The parties discuss the alternative of obtaining a telephonic search warrant. The circuit court rejected Leutenegger's argument that the officer should have attempted to obtain a telephonic warrant based on the court's knowledge that such warrants are highly unusual in Dane County and that there would have been a substantial delay in obtaining a telephonic

---

[7] The officer did not testify that Leutenegger was not moving about, but we think it is obvious that the circuit court made this factual inference. We also conclude that the officer's testimony supports this inference. Appellate courts may assume facts, reasonably inferable from the record, in a manner that supports the trial judge's decision. *See, e.g., State v. Wilks,* 117 Wis. 2d 495, 503, 345 N.W.2d 498 (Ct. App.), *aff'd,* 121 Wis. 2d 93, 358 N.W.2d 273 (1984); *see also State v. Hockings,* 86 Wis. 2d 709, 722, 273 N.W.2d 339 (1979).

warrant. We need not decide whether a circuit court may rely on personal knowledge of such matters when ruling on a suppression motion. Even under optimal circumstances, it would have taken several minutes to contact a judge, relate the facts, and obtain a telephonic warrant. The delay inherent in obtaining a search warrant would have been in conflict with the very reasons it was reasonable for the officer to immediately enter the garage without a warrant; that is, there was reason to believe that Leutenegger was currently in distress or might abruptly decide to drive back out of the garage.

¶ 32. Accordingly, we affirm the circuit court's conclusion that exigent circumstances justified the warrantless entry of Leutenegger's garage. It follows that we affirm the denial of Leutenegger's suppression motion.

*By the Court.*—Judgment affirmed.