ANN WALSH BRADLEY, J.
¶ 72. (dissenting). The maj ority's application of the Fourth Amend- *102 merit's protections creates a great inequity among the people of Wisconsin. The Fourth Amendment protects the "right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures ..."
¶ 73. It does not distinguish among the types of dwellings we call home, giving one more protection than another. There is no room in the language for this court to do otherwise. Nevertheless, under the majority opinion, the protections of the home now apparently depend on whether an individual lives in a single-family or multi-family dwelling.
¶ 74. The majority concludes that Dumstrey's locked underground parking garage that is attached to his apartment building is not curtilage. Majority op., ¶ 51. As a result, it allows the Government to forcibly enter Dumstrey's locked, underground parking garage without a warrant.
¶ 75. The analysis of the majority is infirm in a number of ways: (1) it conflates curtilage with a reasonable expectation of privacy; (2) it skews the analysis by shifting the focus onto the other tenants in Dumstrey's building, rather than on the government; and (3) it disregards controlling Supreme Court precedent. Perhaps its biggest infirmity is that it ignores the collective right that residents of apartments or condominiums have to exclude all individuals that do not have a legitimate purpose on their property.
¶ 76. Contrary to the majority, I conclude that the parking garage here is curtilage. As a result, the government's warrantless, non-consensual intrusion into Dumstrey's parking garage and the resulting search and seizure, violated Dumstrey's Fourth Amendment rights. Accordingly, I respectfully dissent.
*103 I
¶ 77. The primary issue presented is whether Dumstrey's garage is curtilage. If it is, then it is considered part of the home for Fourth Amendment purposes.
¶ 78. "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961). "[T]he right to retreat would be significantly diminished if police could enter a man's property to observe his repose from just outside the front window. We therefore regard the area 'immediately surrounding and associated with the home' — what our cases call the curtilage — as 'part of the home itself for Fourth Amendment purposes.' That principle has ancient and durable roots." Id. (internal citation omitted).
¶ 79. The determination of whether Dumstrey's parking garage is curtilage presents a fact specific analysis. See, e.g., State v. Leutenegger, 2004 WI App 127, ¶ 21 n.5, 275 Wis. 2d 512, 685 N.W.2d 536. The facts of this case are not in dispute.
¶ 80. Officer Dejaríais was off-duty, on his way home from a Milwaukee Brewers baseball game where he had a couple of beers when he first observed Dumstrey. After observing Dumstrey tailgating and passing other cars, Officer Dejaríais pulled up next to Dumstrey at a red light. Officer Dejaríais was not wearing a police uniform and was driving his own personal vehicle.
*104 ¶ 81. While both vehicles were stopped at a red light, Officer Dejaríais flashed his badge at Dumstrey, and verbally commanded him to wait for the police. Dumstrey stared at Officer Dejaríais with a blank look on his face. When the light turned green, Officer Dejaríais went through the intersection and pulled over. Dumstrey eventually proceeded through the intersection and pulled up next to Officer Dejaríais. Again, Dumstrey did not say anything to Officer Dejaríais, stared at him, and drove away.
¶ 82. Officer Dejaríais followed Dumstrey into the driveway of an apartment building's parking lot. He watched Dumstrey enter an underground parking garage using a remote control to enter the locked garage door. After following Dumstrey into the underground parking garage, Officer Dejaríais parked his car directly under the door to immobilize it, deactivating the security system. When Officer Dejaríais exited his car and made contact with Dumstrey in the parking garage, Dumstrey commented that he did not believe Dejaríais was a police officer.
¶ 83. Dumstrey's parking garage is underground, locked and secured from the general public. Only tenants who pay for a parking spot can access the garage or use the elevator connecting the apartment building to the underground garage.
¶ 84. The State acknowledged that if the garage door had closed before Dejaríais forced it to remain open, it would have been unreasonable under the Fourth Amendment for the State to forcibly break and enter through the garage door to search. Even the majority acknowledges that "Dumstrey has a personal property interest in his parking place in the garage because he lives in the apartment building and pays for his assigned parking location." Majority op., ¶ 48.
*105 ¶ 85. At the outset of its curtilage analysis, the majority at length discusses Katz v. United States, 389 U.S. 348 (1967). Katz considered whether government conduct constituted an unlawful search in violation of the Fourth Amendment by applying the reasonable expectation of privacy test. Id. However, recent United States Supreme Court precedent requires that curtilage be analyzed separately from a reasonable expectation of privacy. See United States v. Jones, 132 S. Ct. 945, 952—953 (2012); see also Jardines, 133 S. Ct. at 1417.
¶ 86. In Jones, the Supreme Court held that the installation of a GPS unit on an individual's vehicle, even if he had no reasonable expectation of privacy, was a search. 132 S. Ct. at 949 (2012). The court explained that "Jones's Fourth Amendment rights do not rise or fall with the Katz [reasonable expectation of privacy] formulation." Id. at 950. Jones is clear that the "Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." Id. at 952 (emphasis in the original). Thus, after Jones, there are now two separate avenues for finding a violation of the Fourth Amendment: (1) trespass of property rights; and (2) a reasonable expectation of privacy.
¶ 87. In Jardines, the Supreme Court held that a police officer's use of a trained police dog on a homeowner's porch was a search within the meaning of the Fourth Amendment. 133 S. Ct. at 1417-18. The court explained that "[a]t the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" 133 S. Ct. at 1414 (quoting Silverman, 365 U.S. at 511). The Jardines decision reinvigorated a test based on trespass of property, emphasizing the impor *106 tance of property rights, even in an area of the home that is semi-public. See also United States v. Burston, _ F.3d _, 2015 WL 7444379 (8th Cir. 2015) (concluding that a grassy area surrounding an apartment was curtilage).
¶ 88. As the Jardines court acknowledged, the porch of a home is a semi-public area. "[T]he knocker on the front door "is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." Jardines, 133 S. Ct. at 1415. An implicit license allows the general public to approach the porch, which is curtilage, and either be received or asked to leave. Id. Thus, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Id. at 1416 (quoting Kentucky v. King, 131 S. Ct. 1849, 1862 (2011)). "The scope of a license-express or implied-is limited not only to a particular area but also to a specific purpose." Id. Accordingly, curtilage may be semi-public for certain purposes and yet still protected from government intrusion.
¶ 89. After Jones and Jardines, courts must analyze first the trespass doctrine separately from the Katz "reasonable expectation of privacy test." Prior federal and state precedent holding that an area is not curtilage based on the Katz "reasonable expectation of privacy test" is no longer controlling. Under the current state of the law, we must weigh property rights more heavily than privacy considerations. The analysis is not whether the area is completely private. Rather, it is whether Dumstrey has a sufficient property interest that would entitle him to be free from government intrusion in this area.
*107 ¶ 90. In examining the contours of curtilage, courts look to United States v. Dunn, where the court identified four factors for determining whether an area is curtilage protected by the Fourth Amendment: (1) the proximity of the area to the home; (2) whether the area was within an enclosure surrounding the home; (3) the nature of the uses to which the area was put; and (4) the steps taken to protect the area from observation by passers-by. 480 U.S. 294, 301 (1987).
¶ 91. The Dunn factors are not a precise formula, but are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration — whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. Although they fail to consider some of the realities of modern urban living, the factors nevertheless are helpful and Dunn remains a quintessential curtilage case.
A.
¶ 92. With the relevant facts and law in mind, we begin our curtilage discussion with the first Dunn factor: proximity to the home. Analyzing the garage's proximity to the home, the majority relies on United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976), for the proposition that in an apartment building "a tenant's [home] cannot reasonably be said to extend beyond his [or her] own apartment and perhaps any separate areas subject to his [or her] exclusive control." Majority op., ¶ 34.
¶ 93. In applying Cruz Pagan, the majority conflates a curtilage analysis with a reasonable expectation of privacy analysis. Cruz Pagan rests its determi *108 nation of curtilage on the Katz reasonable expectation of privacy test. Cruz Pagan, 537 F.2d at 557 (citing Katz, 389 U.S. 347). According to Cruz Pagan, "[t]he legal question which we must resolve is whether the agents' entry into the garage defeated the reasonable expectation of privacy of any of the appellants." Id. at 557.
¶ 94. In addition, the Cruz Pagan court explicitly rejected the trespass analysis which we must now apply. Id. at 558 ("Whether or not the agents' entry was a technical trespass is not the relevant inquiry."). Based on the Katz test which no longer applies to a curtilage analysis under Dunn, the Cruz Pagan court concluded that "a person cannot have a reasonable expectation of privacy... in such a well travelled common area of an apartment house or condominium." Id. at 588.
¶ 95. The majority's analysis of proximity to the home is based on the premise, set forth in Cruz Pagan, that Dumstrey's home "cannot reasonably be said to constitute the entire apartment building." Majority op., ¶ 35. It explains that "his 29 fellow tenants would not consider their individual apartments to be a part of Dumstrey's home, and Dumstrey could not reasonably contend otherwise." Id., ¶ 37. Rather than analyze the distance from the apartment building to the parking garage, the majority analyzes proximity in terms of where in the apartment building Dumstrey has a reasonable expectation of privacy.
¶ 96. According to the majority, if Dumstrey's individual apartment rather than the apartment building is his home, it is not proximate because he has to travel though shared hallways and use a shared elevator to get to the garage. Thus, the majority concludes that "[w]hile the parking garage is located *109 directly beneath the entire apartment building, it does not follow that it is therefore closely proximate to Dumstrey's home." Majority op., ¶ 35.
¶ 97. Given that Cruz Pagan is not controlling as to a curtilage determination, the majority missteps in analyzing proximity only in terms of Dumstrey's individual apartment. Even if Dumstrey has to travel though common areas of his apartment to get to the garage, the real question here is distance, rather than the privacy he has in the hallway or elevator while he travels to the parking garage. Additionally, Cruz Pagan pre-dates Dunn and the court did not apply the requisite Dunn curtilage factors.
¶ 98. In this case, the parking garage is located directly underneath Dumstrey's apartment building. Dumstrey travels from his apartment to the parking garage through a locked hallway and elevator, without ever going outside. As this Court has explained, "no bright-line rule exists for ascertaining when a distance is in close proximity, and cases are often inconsistent in this regard." State v. Martwick, 2000 WI 5, ¶ 33, 231 Wis. 2d 801, 604 N.W.2d 552. For example, in State v. Williford, which is cited by the majority, the court concluded that an uncovered parking lot located in front of the defendant's apartment building "was in close proximity to the building." 767 S.E.2d 139, 143 (N.C. Ct. App. 2015). If an uncovered lot in front of an apartment building is in close proximity to the home, then an underground garage that is accessible without exiting the building is surely in close proximity. Accordingly, I conclude that the parking garage is proximate to Dumstrey's home.
*110 B.
¶ 99. The majority's analysis of the second Dunn factor, whether the area is enclosed, is also based on the Cruz Pagan premise that Dumstrey's home is limited to his own apartment. It reasons that even though the underground parking garage is part of the same enclosure as the apartment building, "Dumstrey's 29 fellow tenants' apartments are likewise included within the same enclosure as his own apartment." Majority op., ¶ 39. According to the majority's analysis, the parking garage must be enclosed within the same four walls of Dumstrey's apartment only, because "it cannot reasonably be contended that each of these tenants' homes constitutes part of Dumstrey's home." Id. This logic finds no support in the law.[1]
¶ 100. In United States v. Perea-Rey, a post -Jones case that applied the Dunn factors, the Ninth Circuit found that a carport met the enclosure factor. 680 F.3d 1179, 1184 (2012). The carport was enclosed by a fence, blocking passersby from entering the driveway and carport. Id. at 1184-85. Although Dumstrey's parking garage was not enclosed by a fence, the locked underground parking garage could only be accessed with a garage door opener or a key for a locked door. A fence may make sense in a rural environment, but a locked *111 garage door serves the same purpose in an urban environment.[2]
¶ 101. In Coffin v. Brandau, the Eleventh Circuit determined that "entering the garage as [the defendant] attempted to close it was a violation of the Fourth Amendment." 642 F.3d 999, 1013 (11th Cir. 2011). The Brandau court concluded that the garage was enclosed because "the attached garage has walls on three sides and has the capability, if the outside door is rolled down, of being closed to maintain privacy." Id. at 1012. It is clear from Officer DeJarlais's actions that the locked garage door blocked passersby from entering Dumstrey's parking garage. The only reason Officers Dejaríais and Lichucki were able to access Dumstrey's garage was because Officer Dejaríais used his vehicle to forcibly keep the garage door open. Thus, I conclude that Dumstrey's parking garage is enclosed.
C.
¶ 102. In analyzing the nature of the use, the third Dunn factor, the majority cites to a string of cases that conclude unattached, unenclosed parking garages are not curtilage. See Majority Op., ¶ 41 (citing Williford, 767 S.E.2d at 142-43 (entry into a parking lot *112 directly adjacent to a multi-unit apartment building); Mack v. City of Abilene, 461 F.3d 547, 554 (5th Cir. 2006) ("the parking space was in an open parking lot, the lot is a common area used for parking with multiple spaces, and a vehicle parked in the lot is not shielded from view by others"); Commonwealth v. McCarthy, 705 N.E.2d 1110, 1113 (Mass. 1999) (common parking lot with guest spaces freely visible to anyone entering the lot); State v. Harnish, 931 P.2d 1359, 1364 (Nev. 1997) (parking lot was open to view of the general public and not enclosed)). Based solely on this, the majority concludes that "parking alone constitutes a use associated with neither an intimate activity of the home nor a privacy of life." Majority op., ¶ 41.
¶ 103. As the dissent in the court of appeals decision recounted, "Dumstrey uses his garage in many of the same ways that middle America utilizes its garages in the 'privacies of life'-the keeping and storing of his vehicle in a secure setting, the ability to have a relatively warm vehicle during Wisconsin's frigid winters, the avoidance of wind and rain when accessing his vehicle, the safety and security of an elevator from garage to residence, and the avoidance of crime in the open streets." Dumstrey, 359 Wis. 2d 624, ¶ 23 (Reilly, J., dissenting). None of these uses would apply to an unenclosed, unattached lot. Accordingly, I conclude that Dumstrey's parking garage is used for the intimate activities of the home.
D.
¶ 104. With respect to the final Dunn factor, the steps taken to protect the area from observation by passers-by, the majority attempts to skew the focus from the government intrusion to the other tenants in *113 the building. The majority claims that "[t]he relevant inquiry □ is not whether the parking garage is generally shielded from the public at large. Rather, we are concerned with whether Dumstrey has taken steps to shield his assigned parking space from the view of passersby within the parking garage." Majority op., ¶ 44.
¶ 105. The majority's shift of exclusive focus on the other tenants finds no support in the law. Even the case the majority cites for this proposition states the opposite: "We have held that an area is not within the curtilage if it is open to public view, and is one which 'visitors and tenants on the property would pass on the way to the front door.'" Commonwealth v. McCarthy, 705 N.E.2d at 1111 (Mass. 1999) (quoting Commonwealth v. Simmons, 466 N.E.2d 85, cert. denied, 469 U.S. 861 (1984)). Dumstrey's parking garage is not open to public view, nor is it an entrance to the building though which visitors would pass because it is locked and fully enclosed.
¶ 106. Under Jones and Jardines, the focus ought to be on whether the garage is private property on which the government cannot trespass, not whether other tenants who share private property also have a right to be there. "The fact that Dumstrey and his cotenants share the garage does not defeat the fact that each of the tenants has secured the garage from the general public and the government through their collective actions. Dumstrey may have a lessened amount of privacy among his fellow tenants, but he and his fellow tenants retain their constitutional right to be free from unreasonable government intrusion." Dumstrey, 359 Wis. 2d 624, ¶ 25 (Reilly, J., dissenting).
*114 ¶ 107. In its attempt to bolster its skewed focus, the majority relies on McCarthy, yet the actual facts of that case make it readily distinguishable. It addressed a visitor's parking space in an open parking lot. In McCarthy, the court explained that "[t]he parking space in which the defendant's car was situated when searched is not only an area that visitors would normally pass through on the way to the building, it is an area specifically designed to accommodate such use by visitors." McCarthy, 705 N.E.2d at 1113. The McCarthy court reasoned that "[b]ecause the defendant had no reasonable expectation of privacy in the visitor's parking space, the space was not within the curtilage of the defendant's apartment."[3] Id. at 1114.
¶ 108. Mistakenly, the majority twice describes the parking lot in McCarthy as an "enclosed parking area." Majority op., ¶ 44. However, in discussing McCarthy, the Supreme Judicial Court of Massachusetts commented that "the space was not enclosed in any manner." Commonwealth v. Fernandez, 934 N.E.2d 810, 816 (Mass. 2010). In fact, none of the cases cited by the majority involve a locked, enclosed parking garage. See Majority op., ¶ 41.
¶ 109. In conclusion, a curtilage analysis with the application of the Dunn factors is based on property rights and trespass, not a reasonable expectation of privacy. The proper analytical framework ought to be whether the area is protected from government intrusion, not whether other tenants also have a right to use the garage. Based on the facts of this case as analyzed above, I conclude that Dumstrey's parking *115 garage is curtilage.[4] It was in close proximity to his home, enclosed, was used for the intimate activities of home, and was protected from public view. Thus, the officers' entry into Dumstrey's garage was a trespass in violation of the Fourth Amendment.
II
¶ 110. From the outset, the majority needlessly differentiates between whether a search or a seizure occurred in this case.[5] Although it concludes that Dumstrey was seized in the parking garage, the majority contends that "Dumstrey was not subjected to a search while stopped in the parking garage." Majority op., ¶ 19. In concluding that no search occurred, the majority opinion disregards controlling United States Supreme Court precedent. See Jones, 132 S. Ct. 945. "Jones provides the bright-line rule: when government agents physically touch a person's property, then a search occurs under the Fourth Amendment." Paul A. Clark, Do Warrantless Breathalyzer Tests Violate the Fourth Amendment, 44 N.M. L. Rev. 89, 105 (2014).
¶ 111. In Jones, "[t]he Government physically occupied private property for the purpose of obtaining information." 132 S. Ct. 945, 949 (2012). The Jones *116 court determined that "[w]e have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." Id.; see also United States v. Perea-Rey, 680 F.3d 1179, 1185 (2012) ("Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches."); see also Florida v. Jardines, 133 S. Ct. 1409, 1417 ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").
¶ 112. The court in Perea-Rey, which is factually similar to this case, determined that a border agent's trespass into a carport was a warrantless search that violated the Fourth Amendment. 680 F.3d at 1189. In that case, a border patrol agent entered a carport attached to the side of a house. Id. at 1183. The border agent made contact with Perea-Rey in the carport and instructed him to wait in the carport until other agents arrived and arrested him. Id. Following the Supreme Court's holdings in Jones and Jardines, the Perea-Rey court applied the Dunn factors. It determined that because the carport was curtilage, the border agent had conducted a search in violation of the Fourth Amendment when he occupied the carport without a warrant. Id. at 1189.
¶ 113. Similarly, in this case, Officers Dejaríais and Lichuki occupied private property when they entered Dumstrey's parking garage without a warrant. Dejaríais deactivated the locked underground garage's security system by forcibly preventing the garage door from closing. As he testified:
My vehicle was partially outside and the front end was inside. That way I knew when the officers got there *117 they would be able to get into the garage otherwise the garage door would have come down and they wouldn't have been able to get in. So I purposefully stayed in the center so the garage door wouldn't come down.
Officer Lichucki arrived and entered Dumstrey's garage through the door that was forcibly kept open by Officer DeJarlais's car.
¶ 114. The officers also entered the garage for the purpose of obtaining information. Lichucki testified that he entered the garage in order to begin "the investigation as far as what happened." As the majority explains, "Officer Lichucki questioned Dumstrey and observed his physical characteristics, including his swaying, slurred speech, glassy and bloodshot eyes, and the odor of intoxicants emanating from his person." Majority op., ¶ 18. He asked Dumstrey to perform three field sobriety tests and submit to a breathalyzer test.[6] Dumstrey refused and was arrested for operating while intoxicated.
¶ 115. The majority contends that no search occurred because Officer Lichucki arrested Dumstrey "based on observations of his physical characteristics without further invading his bodily integrity." Majority op., ¶ 20. It incorrectly relies on the "plain view" doctrine, which allows police to seize evidence in plain view without a warrant under certain circumstances. Arizona v. Hicks, 480 U.S. 321, 325 (1987). However, the "plain view" exception does not apply when officers encroach on a protected area. See, e.g., Jones, 132 S. Ct. 945, 952 ("the officers in this case did more than *118 conduct a visual inspection . . . officers encroached on a protected area.") (emphasis supplied).
¶ 116. The correct determination of whether a search occurred depends on whether the parking garage is curtilage. The majority's analysis is backwards because it concluded that no search occurred before determining whether the garage is curtilage. It disregards controlling Supreme Court precedent by ignoring the rule of Jones and Jardines that trespass onto a protected area in order to obtain information is a search in violation of the Fourth Amendment. See Jones, 132 S. Ct. at 949; see also Jardines, 133 S. Ct. at 1417. As set forth above, Dumstrey's garage is curtilage. Thus, the officers conducted a warrantless search in violation of the Fourth Amendment when they occupied a protected area of Dumstrey's home in order to obtain information.
¶ 117. In sum, for the reasons set forth above, I conclude that the parking garage here is curtilage. As a result, the warrantless intrusion into Dumstrey's locked underground parking garage, and the resulting search and seizure, violated Dumstrey's Fourth Amendment rights. Accordingly, I respectfully dissent.
¶ 118. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

 Although not cited in support of its "enclosure" analysis, the majority cites to a string of cases allegedly supporting its "nature of use" analysis that hold that unenclosed parking lots are not curtilage. Majority op., ¶ 41. Not a single case cited by the majority analyzes the enclosure in terms of whether it is contained within the four walls of an individual tenant's apartment.

 Although we must apply the Dunn factors, I observe that this framework is imperfect in determining curtilage in an urban setting. The curtilage factors in Dunn arose in, and apply primarily to, rural dwellings. See Carrie Leonetti, Open Fields in The Inner City: Application of the Curtilage Doctrine to Urban and Suburban Areas, 15 Geo. Mason U. Civ. Rts. L. J. 297, 311 (2005) (explaining "[o]ne of the difficulties in the application of the Dunn factors to urban areas is their epistemological reliance upon a suburban conceptual framework. Factors like proximity to the home or the existence of a fence make sense only in a relatively rural area.").

 As discussed above with respect to United States v. Cruz Pagan, the McCarthy case was decided prior to Jones and is of limited analytical value because its curtilage analysis is based in part on the Katz reasonable expectation of privacy test.

 After concluding that Dumstrey's garage is curtilage and that the police trespassed in violation of the Fourth Amendment, I do not need to reach the issue of whether Dumstrey had a reasonable expectation of privacy in the garage. Under Jones, the Katz reasonable expectation of privacy test is only applicable to cases when there was no trespass onto a constitutionally protected area. See, e.g., United States v. Jones, 132 S. Ct. 945, 953-54 (2012) (explaining that situations in which there is no trespass are still subject to the Katz reasonable expectation of privacy test).

 This issue was not briefed or argued by either of the parties, nor is it necessary to the outcome of the case.

 The majority concedes that a blood draw is a search under the Fourth Amendment, but contends that no search occurred here because Dumstrey refused to submit to a breathalyzer test. Majority op., ¶ 20 n.5.