STATE of Wisconsin, Plaintiff-Respondent,

v.

David M. LARSEN, Defendant-Appellant.†

Court of Appeals

*No. 2006AP1396–CR. Submitted on briefs March 5, 2007.*
*—Decided May 2, 2007.*

2007 WI App 147

(Also reported in 736 N.W.2d 211.)

† Petition to review denied 7/17/07.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jefren E. Olsen*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Daniel J. O'Brien*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J. David M. Larsen appeals a

judgment of conviction for one count of attempted first-degree intentional homicide and two counts of interference with child custody. Larsen contends that the circuit court erred in concluding that the emergency doctrine justified the police search of his residence in a kidnapping investigation. He asserts that the officers did not possess a reasonable basis for concluding that entry was necessary in order to provide immediate aid or assistance to a person in danger. Larsen further maintains that the emergency doctrine does not permit a search for information on the kidnap victims' whereabouts.

¶ 2. We conclude that in kidnapping cases, the emergency doctrine permits a search not only for the kidnap victim, but also for evidence that might lead to the victim's location. The officers in this case reasonably believed the kidnap victims to be in imminent danger of physical harm and that their search of Larsen's residence would result in finding the victims or evidence that would lead them to the victims. We affirm.

## FACTS

¶ 3. On January 31, 2004, at 10:57 a.m., the Racine County Sheriff's Department received a 911 call from an unidentified female stating that she was having difficulty breathing. The dispatcher determined that the female placed the call from an address on Oakridge Drive in Wind Lake. Mark Anderson and Thomas Sweet, two Racine County Sheriff's Department officers, were dispatched to the scene. Upon arrival, the officers and the responding rescue personnel attempted to make contact with someone inside the home. They rang the doorbell, knocked on the doors and windows and looked through the windows to the interior of the

residence. The officers and emergency responders attempted to get a response from inside the house for fifteen to twenty minutes, but were not successful. Dispatch called the telephone number listed for the home, but the answering machine picked up. The officers then verified the address with the dispatcher, who informed them that the residence belonged to Larsen, and broke in through a door window and entered the home. The officers and responders conducted a search of the home looking for the 911 caller with the breathing problem. They announced their presence and looked in the bedrooms, the bathrooms, the living room, the kitchen, the basement, the accessible part of the garage and the closets. The officers and responders conducted a second search, but again did not find anyone or evidence to suggest the home was a crime scene.

¶ 4. Having determined that no one was in the home, the officers secured the door, cleaned up the broken glass and returned to the police department. While at the police department, Sweet took a call from David Nicolai who stated his concern about his wife, Teri Jendusa-Nicolai, and her two young children. Nicolai informed Sweet that Jendusa-Nicolai had gone to pick up her two children from her ex-husband's home on Oakridge Drive and she should have returned home with them already. Nicolai also told Sweet about his wife's "contentious" relationship with her ex-husband and that because of a previous assault she would not have entered the home. Nicolai stated that a neighbor had seen Jendusa-Nicolai's car outside the Oakridge Drive residence.

¶ 5. At some point during this conversation, Sweet realized that Nicolai was referring to the same residence that was the subject of the rescue call. Given

the information Nicolai provided, Sweet determined that a crime may have been committed and he and Anderson returned to the Larsen residence. They arrived around 12:30 p.m. Anderson confirmed that the house was still secure and then both officers conducted a neighborhood canvass to determine if any of the neighbors had information about the location of Jendusa-Nicolai, the two children or her car.

¶ 6. During the fifteen- to twenty-minute canvass, the officers learned that earlier in the day, one of the neighbors had seen Larsen loading Jendusa-Nicolai's car onto a trailer. In addition, Sweet took another call from Nicolai who told him that he received a brief call from his wife and that she was in the back of her ex-husband's truck "in distress." Sweet also learned from dispatch that the Milwaukee County Sheriff's Office received a 911 call from Jendusa-Nicolai, who reported that she was bound and under a tarp in the back of a pickup truck driven by Larsen and that she did not know her location.

¶ 7. Sweet was concerned that there was an ongoing crime and decided to request assistance in the investigation. Around 12:48 p.m., he notified the detective bureau about the situation. At 1:14 p.m., Sweet updated an earlier "attempt to locate" bulletin so that it listed Jendusa-Nicolai as "missing [and] endangered" and Larsen as wanted for false imprisonment. Sweet instructed dispatch to issue a formal Amber Alert at 1:45 p.m.

¶ 8. After Sweet notified the detective's bureau, Racine County Sheriff's Department investigators, John Hanrahan and Eileen Reilly, began trying to collect information. At approximately 1:20 p.m., the investigators arrived at Larsen's father's home to see if Larsen had gone there, but the neighbors had not seen

Larsen's father for a couple of days. They then drove to Nicolai's home in Wind Lake, arriving around 2:09 p.m. Reilly and Hanrahan spoke with Nicolai, Sweet and Anderson, who advised them that children were involved in the situation and that Jendusa-Nicolai had placed a second call indicating she was being abducted or kidnapped. The investigators also questioned friends of Larsen, who informed them that the relationship between Larsen and Jendusa-Nicolai had been tenuous since the divorce and that Larsen was an air traffic controller at a Chicago area airport, owned a gun and had property in Milwaukee and in rural Racine county. The investigators then headed for Larsen's home, arriving at around 3:18 p.m.

¶ 9. In the meantime, Hanrahan had briefed Keith Dobesh, also an investigator, on the situation and asked for his assistance. The two discussed the possibility of contacting the district attorney's office to find out if the exigent circumstances exception to the warrant requirement allowed them to reenter the home. Dobesh contacted the district attorney and relayed to him the information he received from Hanrahan concerning the situation. The district attorney told Dobesh to enter the home and look for the children or anything else that might assist in finding them. Dobesh called Hanrahan, apprised him of the district attorney's advice and proceeded to Larsen's home to assist with the entry and search.

¶ 10. When Hanrahan and Reilly arrived at the scene, they met up with Anderson who was securing the scene. Anderson advised the investigators that he had been in the home already with a rescue squad looking for Jendusa-Nicolai, but was unsuccessful. Hanrahan, Reilly and Anderson entered the home at 3:28 p.m.

Sometime shortly thereafter, Dobesh and Christopher Schmaling, also an investigator, arrived and entered the residence.

¶ 11. The investigators searched the home for Jendusa-Nicolai, her two children and any information about their whereabouts. The investigators saw in plain view a large, two feet-in-diameter bloodstain on the carpet near a dinette table, an overturned chair next to the table and a baseball bat resting against the wall near the table. In the kitchen, the investigators found a garbage pail that contained duct taped and blood-stained clothing. However, the investigators concluded in the beginning stages of the search that the victims were not inside of the home.

¶ 12. The investigators also looked for items such as ransom notes, maps or suicide notes that might suggest the location of the alleged victims. The investi-gators sought the addresses of the properties Larsen owned, thinking he may have taken the three alleged victims to one of those properties. The investigators searched through drawers, piles of documents, boxes and other containers. Early in the search, the investi-gators discovered divorce documents listing the ad-dresses of Larsen's three Milwaukee properties and places in Wheeling, Illinois, Skokie, Illinois, and Elm-wood Park, Illinois. The relevant authorities were con-tacted so that these addresses could be checked out. The investigators also found an empty gun box in Larsen's bedroom closet and relayed this information over the air at 4:15 p.m. The search of Larsen's home for information about the whereabouts of Jendusa-Nicolai and her two children continued until around 9:30 p.m. By that time, Larsen had been apprehended and was in custody at the police department in Wheeling, Illinois and the two children had been found alive at the

Elmwood Park, Illinois residence. The following day the Wheeling police found Jendusa-Nicolai alive in a plastic garbage can in a self-storage unit that Larsen rented.

¶ 13. The State filed a multiple-count information against Larsen, which included charges of attempted first-degree intentional homicide and kidnapping, both by use of a dangerous weapon, and intentional interference with child custody. Larsen filed a motion to suppress the evidence seized as a result of the second of the two entries into his home. After a series of evidentiary hearings, the circuit court denied the motion. The circuit court determined that the search was justified under the emergency exception to the warrant requirement. Larsen ultimately pled no contest to one count of attempted first-degree intentional homicide and two counts of interference with child custody.

## STANDARD OF REVIEW

¶ 14. When we review the denial of a suppression motion, we will uphold the factual findings of the trial court unless clearly erroneous. *State v. Washington*, 2005 WI App 123, ¶ 11, 284 Wis. 2d 456, 700 N.W.2d 305. Whether the facts, as found, satisfy constitutional requirements is a question of law, which we review de novo. *Id.*

## DISCUSSION

¶ 15. Larsen challenges the trial court's application of the emergency doctrine. He maintains that the emergency doctrine justifies a warrantless search only if the search is necessary to provide immediate aid or assistance to a person in danger who is inside the home.

Larsen claims that the officers had already searched the home and knew that there was no one present inside in need of assistance and therefore their search was unlawful. He further contends that the emergency doctrine does not condone warrantless searches for evidence of the location of potential kidnap victims.

¶ 16. The Fourth Amendment protects against unreasonable searches and seizures. *State v. Richter*, 2000 WI 58, ¶ 27, 235 Wis. 2d 524, 612 N.W.2d 29. Under both the United States and Wisconsin Constitutions, a warrantless search is per se unreasonable, and evidence derived from it will be suppressed, subject to certain exceptions. *State v. Williams*, 2002 WI 94, ¶ 18 and n.5, 255 Wis. 2d 1, 646 N.W.2d 834; *State v. Boggess*, 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1982) (citations omitted). These exceptions are "jealously and carefully drawn" and "the burden rests with those seeking exemption from the warrant requirement to prove that the exigencies made that course imperative." *Boggess*, 115 Wis. 2d at 449.

¶ 17. In *State v. Pires*, 55 Wis. 2d 597, 603–04, 201 N.W.2d 153 (1972), our supreme court approved the emergency doctrine as an exception to the warrant requirement. *Boggess*, 115 Wis. 2d at 450. The emergency doctrine recognizes that the Fourth Amendment does not bar a government official from making a warrantless intrusion when the official reasonably believes a person within is in need of immediate aid or assistance and immediate entry into an area in which a person has a reasonable expectation of privacy is necessary to provide that aid or assistance. *Id.* at 450, 452; *State v. Rome*, 2000 WI App 243, ¶ 12, 239 Wis. 2d 491, 620 N.W.2d 225. The emergency doctrine is grounded on

the notion that the preservation of human life is paramount to the right of privacy protected by the Fourth Amendment. *Boggess*, 115 Wis. 2d at 450; *Rome*, 239 Wis. 2d 491, ¶ 12.

¶ 18. The parties express some confusion over whether an officer's subjective motivations are relevant in determining whether his or her actions violate the Fourth Amendment in emergency doctrine matters. Recent cases from our supreme court and the United States Supreme Court clarify that whether a warrantless home entry is justified based on the need to render assistance or prevent harm is judged by an objective test. *State v. Leutenegger*, 2004 WI App 127, ¶ 19, 275 Wis. 2d 512, 685 N.W.2d 536; *Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1948 (2006).

¶ 19. In *Leutenegger*, an "exigent circumstances" case, we formulated the test as " '[w]hether a police officer under the circumstances known to the officer at the time [of entry] reasonably believes that delay in procuring a warrant would gravely endanger life . . . .' " *Leutenegger*, 275 Wis. 2d 512, ¶ 19 (citations omitted). Although we also suggested that an officer's subjective beliefs still may play a role in determining objective reasonableness, *id.*, the United States Supreme Court recently flatly rejected the argument that an officer's subjective motivations are in any way relevant to the inquiry. *Brigham City*, 126 S. Ct. at 1948. The objective test alone controls. *See id.*

¶ 20. Larsen first contends that because the officers had already conducted a thorough search of the home, they had no reason to believe that there was anyone inside in need of immediate assistance. We disagree.

¶ 21. When the officers and emergency personnel conducted the first search, they knew only that a woman at the residence who was having difficulty breathing had called 911. This search lasted only fifteen to twenty minutes and ended when the police did not locate the caller. The additional information received after the entry heightened the emergency and revealed the involvement of children. The officers learned that the caller was Jendusa-Nicolai who was bound and in the back of Larsen's truck and unaware of her location. The officers knew that she and Larsen had a contentious relationship and that she would not enter his house due to a previous assault. They also were aware that she had gone to Larsen's house to pick up her children, but that Jendusa-Nicolai had not mentioned her children in her calls to her husband or the police. It was entirely reasonable for the police to conclude from this information that the children were not with Jendusa-Nicolai and Larsen, that they may have been left behind somewhere in the residence and that their lives were in danger. These changed circumstances therefore reasonably demanded a different and more thorough search of the residence, this time for small children who potentially needed immediate aid.

■■■

¶ 22. Larsen next contends that even if the emergency doctrine justified a search for the children, the officers exceed the scope of a permissible emergency doctrine search when they searched the residence for information on the whereabouts of Jendusa-Nicolai and her two children. We are not aware of any Wisconsin case addressing the question Larsen presents—whether the emergency exception to the warrant requirement permits not only a search for the kidnap victim, but also for evidence that might lead to his or her location.

Courts in other jurisdictions have considered this very issue and have approved warrantless searches of premises for evidence of the whereabouts of a kidnap victim who was reasonably believed by the police to be in imminent danger of harm.

¶ 23. In *Chaney v. State*, 612 P.2d 269 (Okla. Crim. App. 1980), an Oklahoma court upheld a warrantless search of the residence of a suspected kidnapper on the grounds that an emergency existed. *Id.* at 276–77. There, a man informed the FBI that he had received a ransom demand for the return of his wife. *Id.* at 277. The FBI made arrangements to trace any additional calls made to the man. *Id.* The next day, the man received a second call demanding ransom and explaining the procedure for payment of the ransom. *Id.* The call was traced to the defendant's residence. *Id.* Later that evening, the kidnapper placed a third call during which he accused the man of not following his demands and threatened to kill the man's wife. *Id.* The law enforcement officers responded by entering and searching the defendant's residence. *Id.* In the course of the search, they discovered evidence the State introduced against him at trial. *Id.* The court upheld the search, even though the defendant claimed the police had time enough to obtain a warrant between the time of the last call and the arrest. *Id.* The court held that "an emergency effort to save the victims' lives was of paramount importance" and justified "a warrantless search for either the victims *or evidence of their location.*" *Id.* (emphasis added).

¶ 24. In *State v. Matthews*, 665 N.W.2d 28, 30, 41 (N.D. 2003), the court upheld the search of a defendant's house after the police received a call that the defendant and his employee were being held at gunpoint at an unknown location. The officers knew

that the defendant and his employee had gone to collect on a business-related debt and the defendant operated his business out of his own home. *Id.* at 40. The court explained that the officers therefore had a reasonable basis for believing that a search would produce the victims "or information leading to their location." *Id.*

¶ 25. In *People v. Bondi*, 474 N.E.2d 733, 735–736 (Ill. App. Ct. 1984), a missing person's case, the court drew a similar conclusion. The court upheld a warrantless search of the missing person's and defendant's home and surrounding property. *Id.* The court found that the report of the person's disappearance gave the authorities reasonable grounds to believe that she may be in imminent danger of death or serious bodily harm and that her residence and surrounding property were the most likely places to search for evidence of the whereabouts of a missing occupant. *Id.* at 736.

¶ 26. Of similar effect are *United States v. Bell*, 357 F. Supp. 2d 1065, 1075 (N.D. Ill. 2005), and *People v. Lucero*, 750 P.2d 1342, 1347 (1988). In each of these cases, the courts found that exigent circumstances justified warrantless searches for both the kidnap victims and information leading to their discovery. *Bell*, 357 F. Supp. 2d at 1075 (upholding the search of a safe in the defendant's hotel room, explaining that the officers had an objectively reasonable basis to believe that a search of the hotel safe would result in finding evidence leading to a kidnap victim's location); *Lucero*, 750 P.2d at 1347 (upholding under the exigent circumstances doctrine a warrantless search that was undertaken to find two missing girls "or clues to their location").

¶ 27. We find these cases persuasive. The very nature of kidnapping investigations present "unusually compelling circumstances for emergency analysis . . . . The life, freedom and future of a human being [are] at

stake. The victim, even if presently being adequately cared for and safe, could at any moment be harmed or be absconded to a point beyond discovery." *Oliver v. United States*, 656 A.2d 1159, 1167 (D.C. 1995). Thus, it only makes sense that if it is permissible "to enter premises to rescue a threatened kidnap victim thought to be within, then surely it must likewise be permissible to make an immediate warrantless entry upon a reasonable belief that information therein will disclose where that victim is being held." 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.5(d) (4th ed. 2004). Accordingly, we hold that the emergency doctrine permits officers investigating a kidnapping case to conduct a warrantless search if the officers possess an objectively reasonable belief that the particular search will result in finding the victim or evidence leading to the victim's location.

¶ 28. Here, the officers possessed an objectively reasonable belief that a thorough search of Larsen's home would not only result in finding the children, but also in producing information leading to the whereabouts of both Jendusa-Nicolai and her children. During the course of the investigation, the officers learned that Larsen owned properties in Milwaukee and worked at an airport in the Chicago area. It was reasonable for the officers to believe that Larsen may have taken Jendusa-Nicolai or her children to Milwaukee or somewhere near Chicago and that a thorough search of Larsen's residence would reveal the relevant addresses.

¶ 29. Lastly, Larsen suggests that the delay between the first and second searches "militates against the conclusion that there was an emergency justifying the second entry and search of the home." Citing cases where a lengthy delay rendered a search invalid, Larsen

argues that the officers should have used this time to secure a search warrant. Larsen minimizes the seriousness of the situation.

¶ 30. The emergency did not dissipate until Jendusa-Nicolai and her two children were located. That the police first proceeded with an investigation outside of the residence and also contacted the district attorney for advice before entering the residence did not in any way diminish the very real threat to the safety of Jendusa-Nicolai and her two children.[1] Further, it would have been unreasonable for the officers to cease their emergency efforts to locate the three potential kidnap victims in order to obtain a warrant. As noted, a kidnap victim is placed in continuing danger of harm at the hands of his or her captor. *Oliver*, 656 A.2d at 1168. Police need not delay rescue, where as here, they reasonably believe that a kidnap victim is being held and a search of the premises will lead to the victim or to information about the victim's whereabouts. In such a circumstance "time is of the essence." *See id.*

## CONCLUSION

¶ 31. The circuit court properly denied Larsen's motion to suppress based on the emergency doctrine. The emergency doctrine permitted the search for both the alleged kidnap victims and evidence leading to their location. The judgment of conviction is affirmed.

*By the Court.*—Judgment affirmed.

---

[1] Larsen also intimates that if the police were subjectively concerned that the children were inside the home and in danger, they would have acted sooner. However, as explained, the subjective motivation of the officers is not relevant. *See Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1948 (2006).