# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3088

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID M. LARSEN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 29—**Rudolph T. Randa**, *Judge.*

ARGUED MAY 5, 2009—DECIDED AUGUST 4, 2010

Before RIPPLE and SYKES, *Circuit Judges*, and LAWRENCE, *District Judge.*[1]

SYKES, *Circuit Judge.*  David Larsen brutally beat Teri Jendusa-Nicolai, his ex-wife, at his home in Wisconsin. He then bound her with duct tape, stuffed her in a

---

[1] The Honorable William T. Lawrence of the United States District Court for the Southern District of Indiana, sitting by designation.

garbage can filled with snow, put the can in the back of his truck, and drove to a self-storage facility in Illinois. He left her there—still bound and in the snow-filled garbage can—in an unheated rented storage locker. She was discovered the next day, about an hour from death.

Larsen was charged with state and federal crimes; the state charges were resolved first. *See State of Wisconsin v. Larsen*, 2007 WI App 147, 302 Wis. 2d 718, 736 N.W.2d 211. Thereafter in federal court, Larsen waived his right to a jury and after a trial to the court was convicted of two counts: kidnapping in violation of 18 U.S.C. § 1201(a)(1), and interstate domestic violence in violation of 18 U.S.C. § 2261(a)(2) and (b)(2) (the Interstate Domestic Violence Act). The district judge sentenced him to life in prison, which exceeded the recommended sentencing-guidelines range.

Larsen challenges both his convictions and his sentence. His first claim on appeal is a Commerce Clause challenge to the Interstate Domestic Violence Act; he contends that the Act unconstitutionally federalizes purely local violent crime with an insufficient nexus to interstate commerce. He next argues that his convictions for kidnapping and interstate domestic violence are multiplicitous in violation of the Double Jeopardy Clause. He also maintains that a warrantless search of his home on the afternoon of the victim's disappearance was unjustified under the emergency doctrine and therefore unreasonable in violation of the Fourth Amendment. Finally, he challenges his life sentence to the extent that the judge's decision to impose it was based

on Jendusa-Nicolai's having suffered a miscarriage three days after the attack.

We reject these arguments and affirm. The Interstate Domestic Violence Act punishes those who use "force, coercion, duress, or fraud" to cause a domestic partner to travel in interstate commerce and who commit a violent crime against the victim "in the course of, as a result of, or to facilitate" that interstate travel. 18 U.S.C. § 2261(a)(2). This statute lies well within the scope of Congress's power to regulate the channels or instrumentalities of, or persons in, interstate commerce. We further conclude that Larsen's convictions are not multiplicitous; the crimes of kidnapping and interstate domestic violence contain different elements, and each requires proof of a fact that the other does not. The district court's admission of physical evidence obtained during the warrantless search of Larsen's home was ultimately harmless, even if it was error; the evidence of Larsen's guilt was overwhelming and uncontroverted. Finally, Larsen's life sentence was not unreasonable, either on its own terms or because the judge's decision to impose it was based primarily on Jendusa-Nicolai's miscarriage.

## I. Background

On January 31, 2004, David Larsen brutally attacked Teri Jendusa-Nicolai, his ex-wife, when she came to his home in Racine County, Wisconsin, to pick up their two young daughters. The couple had divorced three years earlier after an abusive marriage, and Jendusa-

Nicolai had recently taken Larsen to court for nonpayment of child support. Larsen lured her into his home and began to beat her with a baseball bat, strangle, and smother her. When she did not succumb, he bound her head, ankles, and wrists with duct tape and placed her in a garbage can filled with snow. He then put the garbage can, with Jendusa-Nicolai inside, in the back of his pick-up truck and drove to a self-storage facility in Illinois where he had a rented storage locker. He left her there to die, in a cold storage locker, in the snow-filled garbage can with boxes wedged around it to prevent her from climbing out.

During the drive to Illinois, Jendusa-Nicolai managed to free her hands and call 911 from her cell phone. She gave Larsen's home address, and local law enforcement and rescue personnel broke into Larsen's home around 11 a.m. in an attempt to find Jendusa-Nicolai. They remained inside for about 15 minutes—just long enough to ascertain that she was not there. Jendusa-Nicolai was able to make two more calls from her cell phone: She called her husband at noon and called 911 a second time around 2 p.m. At one point along the route to Illinois, she tried to extend her hand outside the garbage can in an effort to attract the attention of passing motorists. Larsen saw this, hit her again, and confiscated her cell phone.

From the second and third phone calls, the police learned that Jendusa-Nicolai was bound and in the back of Larsen's truck. They also learned that Jendusa-Nicolai's two daughters were missing. At about 3:30 p.m.,

law-enforcement officers and a rescue team reentered Larsen's home after the Racine County District Attorney concluded that exigent circumstances existed for a warrantless search. The police searched the house thoroughly for six hours looking for the two missing children as well as clues about Jendusa-Nicolai's whereabouts. They went through papers, played back voice-mail messages, and searched through Larsen's computer files. During this search, they observed a large quantity of blood in the front hall, as well as an overturned chair, a blood-stained bucket, sweatpants with duct tape around the ankles, and blood-stained gloves and socks. In the meantime other officers prepared a search-warrant application.

Police arrested Larsen around 6 p.m. that evening when he reported for work. He told investigators that his daughters were at his girlfriend's house but claimed he did not know anything about Jendusa-Nicolai's disappearance. Police recovered the two girls at about 9:45 p.m. and suspended the search of Larsen's home without any further information about Jendusa-Nicolai's location. The search warrant was issued at about 11 p.m.

The next morning, the police searched Larsen's wallet and found two business cards for a storage facility in Illinois. Police called the storage facility, and an employee checked Larsen's unit and heard moaning inside. Local police immediately responded and recovered Jendusa-Nicolai from inside the garbage can. Doctors later said she was about an hour from death: Her body temperature had dropped to 84 degrees, renal failure

had begun, and she was frostbitten about her body. She was hospitalized and suffered a miscarriage two days later while still at the hospital; she estimated that she had been pregnant for about five weeks. All her toes had to be amputated due to frostbite, and her hearing was damaged because of the blows to her head.

Larsen was charged in state court with attempted first-degree intentional homicide and two counts of interference with child custody. *See Larsen*, 2007 WI App 147, ¶ 1. A federal grand jury indicted Larsen on two counts: kidnapping, *see* 18 U.S.C. § 1201(a)(1), and forcibly causing a former spouse to travel in interstate commerce while committing a crime of violence in the course of and to facilitate the travel, *see id.* § 2261(a)(2), (b)(2) (the Interstate Domestic Violence Act). Larsen moved to suppress the evidence recovered in the warrantless search of his home, but the district court denied the motion. Larsen pleaded no contest to the state charges, *see Larsen*, 2007 WI App 147, ¶ 13, and after sentencing he returned to federal court and opted for a bench trial. The case was tried to the court, and at the close of the evidence, Larsen moved to dismiss on two constitutional grounds. He argued first that the Interstate Domestic Violence Act exceeded Congress's legislative power under the Commerce Clause, and second, that the kidnapping and interstate domestic violence charges were multiplicitious in violation of the Double Jeopardy Clause. The district court rejected these arguments and convicted him on both counts.

The sentencing guidelines suggested a sentence of 292 to 365 months, but the judge sentenced Larsen to life

imprisonment on the kidnapping charge and a concurrent term of ten years (the statutory maximum) on the interstate domestic-violence charge. In imposing this above-guidelines sentence, the judge emphasized that Jendusa-Nicolai's miscarriage just days after the assault was a severe aggravating factor that the guidelines had not taken into consideration.

## II.  Discussion

### A.  Commerce Clause Challenge to the Interstate Domestic Violence Act

Larsen first argues that the Interstate Domestic Violence Act is unconstitutional because it exceeds Congress's legislative power under the Commerce Clause. Specifically, he claims that the Act impermissibly regulates purely local, noneconomic conduct that does not have a substantial effect on interstate commerce. The relevant portion of the Act provides as follows:

> A person who causes a spouse, intimate partner, or dating partner to travel in interstate or foreign commerce . . . by force, coercion, duress, or fraud, and who, in the course of, as a result of, or to facilitate such conduct or travel, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner, shall be punished . . . .

18 U.S.C. § 2261(a)(2). We conclude, in line with four other circuits, that the Interstate Domestic Violence Act is a proper exercise of Congress's Commerce Clause power. *See United States v. Lankford*, 196 F.3d 563 (5th Cir.

1999); *United States v. Page*, 167 F.3d 325 (6th Cir. 1999); *United States v. Gluzman*, 953 F. Supp. 84 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 49 (2d Cir. 1998)*; United States v. Bailey*, 112 F.3d 758 (4th Cir. 1997).

The Supreme Court's "modern Commerce Clause jurisprudence has 'identified three broad categories of activity that Congress may regulate under its commerce power.'" *United States v. Morrison*, 529 U.S. 598, 608 (2000) (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)). The Court has held that the Commerce Clause authorizes Congress to regulate the "use of the channels of interstate commerce"; the "instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and "those [intrastate] activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59; *see also Morrison*, 529 U.S. at 608-09; *Perez v. United States*, 402 U.S. 146, 150 (1971). Congress's legislative authority in the first and second categories is plenary. *Cleveland v. United States*, 329 U.S. 14, 19 (1946) ("The power of Congress over the instrumentalities of interstate commerce is plenary . . . ."); *Caminetti v. United States*, 242 U.S. 470, 491 (1917) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question."). Congressional power in the third category, however, extends only to *economic activity* that substantially affects interstate commerce. *Morrison*, 529 U.S. at 611 ("*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regula-

tion of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor.").

Larsen conceptually locates his argument in the third Commerce Clause category. The Act is unconstitutional, he contends, because Congress lacks the authority to punish domestic violence, which is wholly intrastate conduct, noneconomic in nature, and does not substantially affect interstate commerce. This argument is misplaced. The Interstate Domestic Violence Act regulates the channels or instrumentalities of interstate commerce and persons in interstate commerce—not purely intrastate activity—and therefore falls within *Lopez*'s first and second categories, in which Congress has plenary authority to legislate. The Act punishes only those who cause a spouse or intimate partner to "travel in interstate or foreign commerce" and who commit a crime of violence "in the course of, as a result of, or to facilitate" that interstate travel. It is the victim's movement in interstate commerce—not the intrastate crime of violence—that implicates the Interstate Domestic Violence Act.

The Supreme Court has long held that movement of persons across state lines is sufficient to permit congressional regulation under the Commerce Clause. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 573 (1997) (reaffirming that the movement of persons across state lines is a form of commerce); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (holding that the act of crossing state lines need

not be commercial in character); *Caminetti*, 242 U.S. at 491. In *Cleveland* the Supreme Court upheld the Mann Act against a challenge by polygamists who transported their wives across state lines. 329 U.S. 14. The defendants had argued that the Mann Act unconstitutionally regulated marriage, a purely intrastate matter. The Court rejected this argument: "The power of Congress over the instrumentalities of interstate commerce is plenary; it may be used to defeat what are deemed to be immoral practices; and the fact that the means used may have 'the quality of police regulations' is not consequential." *Id.* at 19 (quoting *Hoke v. United States*, 227 U.S. 308, 323 (1913)). And in *Caminetti* the Court upheld the White Slave Act of 1910, which prohibited the transportation of women in interstate commerce for purposes of debauchery or prostitution. 242 U.S. at 491. The Court held:

> The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.

*Id.*

Larsen relies heavily on *Morrison*, but that pivotal case hurts rather than helps his argument. *Morrison* invalidated, on Commerce Clause grounds, a provision in the Violence Against Women Act that provided a civil remedy to victims of gender-related violence. The

Supreme Court analyzed the provision under *Lopez*'s third category—as a regulation of wholly intrastate activity—"[g]iven [its] focus on gender-motivated violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce) . . . ." *Morrison*, 529 U.S. at 609. The Court noted in particular that the statute lacked any jurisdictional element that would "lend support" to the argument that the provision was sufficiently tied to interstate commerce. *Id.* at 613.

There is nothing in *Morrison* that limits Congress's authority to regulate the use of the channels or instrumentalities of, or persons in, interstate commerce. *See, e.g., Cleveland*, 329 U.S. at 16. To the contrary, the Court specifically distinguished the civil remedy in the Violence Against Women Act, which regulated wholly intrastate conduct, from § 2261(a)(1), the criminal-penalty provision at issue here. The Court took note of the "interstate travel" element of the criminal offense and the difference that the presence of this element made in the Commerce Clause analysis: "The Courts of Appeals have uniformly upheld th[e] criminal sanction [§ 2261(a)(1)] as an appropriate exercise of Congress' Commerce Clause authority, reasoning that '[t]he provision properly falls within the first of *Lopez*'s categories as it regulates the use of channels of interstate commerce.'" *Morrison*, 529 U.S. at 613 n.5 (quoting *Lankford*, 196 F.3d at 571-72) (alteration in *Morrison*).

This language, of course, cannot be taken as an explicit endorsement of the conclusion that § 2261(a)(1) sur-

vives Commerce Clause challenge as a regulation of the channels or instrumentalities of, or persons in, interstate commerce; *Morrison* addressed only the civil-remedy provision in the Violence Against Women Act. But the Court's language undermines Larsen's position that § 2261(a)(1) regulates purely intrastate activity and must be analyzed as such under *Lopez* and *Morrison*. Accordingly, we join the Second, Fourth, Fifth, and Sixth Circuits in holding that the Interstate Domestic Violence Act is a valid exercise of Congress's power under the Commerce Clause to regulate the channels or instrumentalities of, or persons in, interstate commerce. *See Lankford*, 196 F.3d at 572; *Page*, 167 F.3d at 335; *Gluzman*, 953 F. Supp. 84*; Bailey*, 112 F.3d at 766.

## B.  Double Jeopardy

Larsen next asserts that his convictions for both kidnapping and interstate domestic violence are multiplicitous in violation of the Double Jeopardy Clause. Kidnapping, he argues, is a lesser-included offense of a violation of the Interstate Domestic Violence Act, and so to punish him for both crimes is to punish him twice for the same offense. *See Illinois v. Vitale*, 447 U.S. 410, 415 (1980).

The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V; *Witte v. United States*, 515 U.S. 389, 395-96 (1995). The double-jeopardy principle implicated here is that a court may not impose cumulative punishments

for the same act unless the legislature intends it. *See Missouri v. Hunter*, 459 U.S. 359, 366 (1983) ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause . . . prevent[s] the sentencing court from prescribing greater punishment than the legislature intended."); *see also United States v. Peel*, 595 F.3d 763, 765-66 (7th Cir. 2010). Accordingly, a person may not be convicted and punished for two separate offenses arising out of the same act unless "each [offense] requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The familiar *Blockburger* test focuses on the statutory elements of the separate offenses.

To obtain a kidnapping conviction, the government must prove that the defendant (1) seized the victim; (2) held the victim "for ransom or reward or otherwise"; and (3) transported the victim in interstate commerce. 18 U.S.C. § 1201(a)-(a)(1); *United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003). The Interstate Domestic Violence Act, on the other hand, requires that (1) the defendant is a spouse, intimate partner, or dating partner of the victim; (2) the defendant caused the victim to travel in interstate commerce by force, coercion, duress, or fraud; and (3) the defendant committed a crime of violence against the victim in the course of, as a result of, or to facilitate the interstate travel. 18 U.S.C. § 2261(a)(2).

Larsen acknowledges that the Interstate Domestic Violence Act requires proof of facts that the kidnapping statute does not: The defendant and the victim must be spouses, intimate partners, or dating partners, and the

defendant must commit a crime of violence against the victim. He contends, however, that the converse is not true; he maintains that kidnapping has no element not also required by the Interstate Domestic Violence Act. Stated differently, Larsen's argument is that the crime of interstate domestic violence encompasses the crime of kidnapping.

We disagree. The kidnapping statute requires that the defendant "hold[ ] [the victim] for ransom or reward or otherwise."[2] This "holding" requirement is an essential element of kidnapping and must be established in every case. *See* 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 18.2 (2d ed. 2009); *Sandoval*, 347 F.3d at 633. Furthermore, the Supreme Court has said that the "holding" requirement "necessarily implies an unlawful physical or mental restraint for an appreciable period." *Chatwin v. United States*, 326 U.S. 455, 460 (1946). The Interstate Domestic Violence Act, on the other hand, does not require that the defendant hold the victim. Rather, the defendant must cause the victim to travel in interstate commerce "by force, coercion, duress, or fraud," and commit a crime of violence against the victim "in the course of, as a result of, or to facilitate" the interstate travel.

---

[2] "Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when the person is willfully transported in interstate or foreign commerce . . . shall be punished by imprisonment for any term of years or for life . . . ." 18 U.S.C. § 1201(a).

Thus, if a defendant (for example) induces his spouse to travel across state lines by coercion or false pretenses and then commits a crime of violence against her when she arrives, he would be guilty of interstate domestic violence but not kidnapping because the "holding" element of kidnapping would be missing. Indeed, three circuits have held that the element of holding distinguishes kidnapping from a violation of the Interstate Domestic Violence Act for double-jeopardy purposes. *See Lankford*, 196 F.3d at 578; *United States v. Sickinger*, 179 F.3d 1091, 1093 (8th Cir. 1999); *Bailey*, 112 F.3d at 767. We see no reason to disagree with this conclusion.

Larsen suggests that even if the two crimes require proof of different elements in theory, in this case the same facts proved both the interstate travel element of interstate domestic violence and the "holding" element of kidnapping. That is, Larsen argues that the government could not prove a violation of the Interstate Domestic Violence Act in this case without also proving that the defendant "held" the victim for purposes of the kidnapping statute. Larsen's argument essentially reiterates the Supreme Court's holding in *Grady v. Corbin*, 495 U.S. 508 (1990), which was overruled as "wrong in principle [and] . . . unstable in application" by *United States v. Dixon*, 509 U.S. 688, 709 (1993). In multiplicity challenges the *elements* of each offense—not the specific offense conduct—determine whether two offenses are the same for purposes of double jeopardy. *See Rutledge v. United States*, 517 U.S. 292, 298 (1996) ("The *Blockburger* test requires us to consider whether . . . the § 846 conspiracy offense requires proof of any *element* that is not a part

of the CCE offense." (emphasis added)). We reiterated this point in *United States v. Hatchett*:

> *Dixon* informs us that in deciding whether two offenses are the same or not, our inquiry must focus on the elements of each of the charged offenses rather than the underlying conduct. *Dixon* re-established the "same elements" test articulated by *Blockburger* as the one and only test that courts are to apply in considering whether a defendant may be . . . punished twice based on a single act or transaction.

245 F.3d 625, 631 (7th Cir. 2001).

Accordingly, it makes no difference that the same evidence established that Larsen forcibly caused Jendusa-Nicolai to travel in interstate commerce and also that he "held" her as required for conviction of kidnapping. Each of these offenses requires proof of an element that the other does not, and that defeats Larsen's multiplicity argument. His convictions do not violate double jeopardy.

## C. The Warrantless Search

Larsen argues that the warrantless search of his home on the afternoon of Jendusa-Nicolai's disappearance was unjustified by the emergency doctrine and therefore violated the Fourth Amendment. During this six-hour search, the police discovered a large quantity of blood on the carpet, an overturned chair, and bloody items of clothing. The district court denied Larsen's motion to suppress this evidence, relying on the exigencies of an

ongoing missing-persons investigation. *See, e.g., United States v. Bell*, 500 F.3d 609, 613 (7th Cir. 2007). Larsen maintains that the emergency (or "exigent circumstances") doctrine does not apply because the police knew before they reentered the home that neither Jendusa-Nicolai nor her children were there and they had plenty of time to get a warrant between the first search at 11:30 a.m. and the second at 3:30 p.m.

We need not decide the merits of the Fourth Amendment question because any error in admitting the evidence was harmless.[3] *See United States v. Pavelski*, 789 F.2d 485, 490 (7th Cir. 1986) (the admission of tainted evidence is harmless if it is clear beyond a reasonable doubt that the verdict would stand without it). The case against Larsen was ironclad. The government presented Jendusa-Nicolai's graphic testimony about how Larsen attacked and kidnapped her; played the tape from the two 911 calls from Jendusa-Nicolai in which she gave Larsen's address and told police she was bound in the back of his truck; and introduced the physical evidence from Larsen's storage locker where Jendusa-Nicolai was found. Indeed, Larsen's written closing argument admitted the facts that had been adduced

---

[3] We note, however, the similarities between this case and our decision in *United States v. Bell*, 500 F.3d 609, 613 (7th Cir. 2007). We also note that the Wisconsin Court of Appeals has upheld this search as reasonable under the Fourth Amendment because the exigent circumstances "did not dissipate until Jendusa-Nicolai and her two children were located." *Larsen*, 2007 WI App 147, ¶ 30.

during the bench trial and instead pressed the two constitutional arguments he has reiterated here. Under these circumstances, the evidence of the blood-stained carpet and clothing was entirely cumulative. The evidence of Larsen's guilt was abundant and conceded, and Larsen's theory of the case was essentially confined to the Commerce Clause and multiplicity challenges. Any error in admitting the physical evidence obtained in the warrantless search of Larsen's home was harmless.

**D.  Larsen's Life Sentence**

Finally, Larsen contends that his sentence is both procedurally and substantively unreasonable. The district judge sentenced Larsen to life imprisonment on the kidnapping charge—two levels higher than the top of his suggested guidelines range—in large part because Jendusa-Nicolai suffered a miscarriage three days after Larsen assaulted and abducted her. Larsen argues first that the evidence was insufficient for the judge to find either that Jendusa-Nicolai was pregnant or that Larsen's conduct caused the miscarriage. He also maintains that the life sentence is substantively unreasonable.

We review sentences for procedural error to ensure that the sentencing judge did not "select[] a sentence based on clearly erroneous facts." *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008). Here, Larsen waived any factual challenge to the evidence that Jendusa-Nicolai suffered a miscarriage. At sentencing Larsen's counsel explicitly acknowledged that a complete understanding of the consequences of Larsen's crimes

included Jendusa-Nicolai's miscarriage: "It's about a physical, brutal assault, and an effort to kill someone. It's about the death of a five week old fetus. Not there in the storage locker . . . but days later in the hospital, *as the presentence report correctly reports*. A miscarriage on Wednesday, following the assault on Saturday." (Emphasis added.) Aside from the waiver, however, both Jendusa-Nicolai and her husband testified to the pregnancy and her miscarriage, and the district judge was entitled to credit their testimony. Finally, it was not clearly erroneous for the judge to conclude that the miscarriage was attributable to Larsen's conduct. It was reasonable for the judge to infer that the severe beating and hours of exposure to the cold caused Jendusa-Nicolai to miscarry—particularly in light of the fact that her doctors estimated that Jendusa-Nicolai was just an hour from death when rescuers found her in Larsen's self-storage locker.

We also conclude that the above-guidelines sentence of life in prison was not an abuse of discretion. The sentence is substantively reasonable given the cold-blooded brutality of Larsen's crimes and the extreme pain and anguish he inflicted—on Jendusa-Nicolai primarily, and on her family as secondary victims. It was entirely fair for the judge to consider the miscarriage as a significant aggravator. The judge took note of the mitigating factors the defense presented at sentencing: Larsen had no prior criminal history, a steady job, and was active in his church. That the judge gave this mitigation little weight is hardly surprising in light of the obvious

severity of these crimes and in any event is not for us to second-guess.

AFFIRMED.